IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | |
|---|---|
| RICHARD HEWLETT, | * |
| Plaintiff, | * |
| vs. | * |
| | *     CASE NO. 3:04-CV-111(CDL) |
| WAFFLE HOUSE, INC., | * |
| Defendant | * |
| | * |

O R D E R

Presently pending before the Court is Defendant Waffle House, Inc.'s Motion for Summary Judgment (Doc. 29). For the reasons set forth below, Defendant's motion is granted as to Plaintiff's federal claims. The Court declines to exercise jurisdiction over Plaintiff's state law claims.

INTRODUCTION

Plaintiff worked as a grill operator for Defendant Waffle House from September 1999 to December 2000 and again from March 2004 until November 2004. This lawsuit concerns Plaintiff's second period of employment with Defendant. Plaintiff contends that Defendant discriminated against him because of his race and in retaliation for his complaint of racial discrimination, and he brings claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII") and 42 U.S.C. § 1981 ("§ 1981"). He also asserts various state law claims, including breach of contract, intentional infliction of emotional distress, and negligent hiring and retention.

Defendant moves for summary judgment on all of Plaintiff's claims. Defendant is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). It is not enough to have *some* alleged factual dispute; there must be a genuine issue of material fact to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A fact is *material* if it is relevant or necessary to the outcome of the suit. *Anderson*, 477 U.S. at 248. A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party—there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Anderson*, 477 U.S. at 248. On a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 251-52. Viewing the facts of this case in the light most favorable to Plaintiff reveals the following.

## BACKGROUND

In March 2004, Defendant hired Plaintiff as a grill operator at Waffle House Unit 1189. Unit Manager Marcia Stephens hired Plaintiff and was his direct supervisor until September 2004, when Burak Altayli became Unit Manager for Unit 1189. At all times relevant to this lawsuit, Rick Sparks was District Manager of Unit 1189, and he supervised the Unit Manager.

2

Defendant contends that it hired Plaintiff as a "part-time" employee, although Plaintiff understood that he would be working "full time," which to him meant thirty to forty hours per week. It is not clear from the record exactly how many hours per week an employee must work to be considered a "full time" employee at Waffle House. According to Stephens, an employee could be considered "full time" if he worked 22 hours per week but would be considered "part time" if he worked less than 19 hours per week. During his first week (March 25, 2004 to March 30, 2004), Plaintiff worked 35.7 hours, and Defendant contends that Plaintiff was given extra hours during that week because it was a holiday week. During his second week (April 2, 2004 to April 3, 2004), Plaintiff worked 20.3 hours.[1] During his third week (April 8, 2004 to April 10, 2004), he worked 20 hours but contends that he had been scheduled for 30.[2] After that, Plaintiff did not work more than 21 hours per week at Waffle House.

Plaintiff's job duties included cooking food orders, cleaning the grill and cooking area, and completing a number of end-of-shift responsibilities. His pay rate was $6.80 per hour. Plaintiff contends that, during his interview, Stephens promised him regular raises. Stephens denies making such a promise. Plaintiff did not receive a pay raise during his 2004 employment with Waffle House.

---

[1] Plaintiff remembers working "close to" forty hours per week during his first two weeks at Waffle House. However, he has no evidence to rebut Defendant's payroll records, which reflect that Plaintiff worked 35.7 hours during his first week and 20.3 hours during his second week.

[2] Plaintiff worked 9.2 hours on April 8 and 9.8 hours on April 10. He claims that he was scheduled to work 10 hours on April 9, but he left his shift after working only an hour because a coworker called him a racial slur. There is no documentary evidence regarding the length of Plaintiff's scheduled shift for April 9.

3

There were no automatic raises for grill operators—to be considered for a raise, grill operators had to complete their end-of-shift responsibilities, be able to cook a minimum of $180 of food per hour, arrive to work on time, and wear a proper uniform.[3]  Stephens did not have the authority to approve a raise for Plaintiff—such a decision would have to be approved by the district manager.  According to Stephens, Plaintiff's performance did not entitle him to be considered for a raise:  he was unable to cook the required amount of food per shift;[4] his "uniform was a constant problem" because he wore a dirty shirt and did not wear appropriate slacks; he was occasionally late to work; and he did not always complete his end-of-shift responsibilities.  Plaintiff admits that he was occasionally late to work and that he violated the uniform policy, and he admits that Stephens spoke with him a number of times regarding these issues.[5]

---

[3] Plaintiff contends that there *were* automatic raises for grill operators, pointing to a portion of Stephens's deposition.  However, that portion of the deposition referred to automatic "longevity" raises for *salespeople*, not grill operators.  Stephens stated unequivocally that there were no automatic raises for grill operators.

[4] Plaintiff disputes Stephens's assessment of his cooking ability, and he points to the statement of a coworker, who described Plaintiff as a "great cook to cook with" who could "probably handle $600 or $700 spread out on his own."  This coworker's opinion of Plaintiff's job performance is insufficient to show that Plaintiff was meeting his supervisor's expectations.  Furthermore, there is no evidence to suggest that Stephens's assessment of Plaintiff's cooking ability was not made in good faith.  It is not clear that the "$600 or $700 spread" Plaintiff could "probably handle" would be sufficient to meet the required amount of food per shift, and there is no evidence that Plaintiff could actually and consistently cook the required amount of food per shift.

[5] Plaintiff contends that these issues are not "actual performance problems" and denies that Stephens "counseled" him.  Rather, he states that she "got on to" him about these issues.  Regardless of how Plaintiff characterizes these problems or Stephens's response to them, it is

4

On April 9, 2004, Stephens interviewed Joseph Gyldholm for a salesperson position at Unit 1189. Gyldholm had worked at a different Waffle House restaurant in the past. In addition to the interview, Gyldholm completed an application and passed a "screening test," which determined, *inter alia*, that he was not on Waffle House's "not for rehire" list. According to Stephens, the restaurant was short staffed, so she asked Gyldholm to begin working within an hour of his interview.[6] Plaintiff was scheduled to work on April 9, 2004, and he and Gyldholm were both working in the restaurant at the same time. At one point during the evening, Gyldholm said to Plaintiff, "you just anybody's nigger." He also clarified to another coworker that he said "nigger, not nigga." Plaintiff was upset and angered by this language. Another coworker called Stephens at home to report the incident. Stephens asked to speak with Plaintiff, but Plaintiff refused to speak with her and said he was going home. Stephens instructed the coworker to tell Plaintiff that she would send Gyldholm home and to ask Plaintiff if he would finish his shift. Plaintiff went home. After Plaintiff went home, Gyldholm worked the remainder of his shift. Gyldholm was terminated at the end of the shift, and he never returned to work at Unit 1189 or any other restaurant owned by Defendant. He was also placed on Defendant's "ineligible for rehire" list.

---

undisputed that proper uniform and punctuality were factors in determining whether Plaintiff deserved a raise, that Plaintiff had problems in these areas, and that Stephens spoke with Plaintiff about these problems.

[6] Plaintiff asserts that Gyldholm did not receive any training regarding discrimination or harassment prior to beginning his shift. The evidence Plaintiff points to on this matter is the evidence that Gyldholm began working an hour after he came in to apply for the job. Plaintiff has pointed to nothing in the record regarding what occurred during this hour.

5

Defendant has published policies prohibiting racial discrimination, racial harassment, and retaliation. Defendant also has a complaint procedure for employees who believe they have experienced discrimination, harassment, or retaliation. One avenue for making a complaint is calling the Waffle House Associate Hotline ("Hotline"). Plaintiff called the Hotline when he got home from work on April 9, and he left a message because the Hotline was not staffed on nights and weekends. He called back on April 12, 2004 and reported the incident to the Hotline. Valencia Porter, Waffle House's Employment Counselor, sent Plaintiff a letter explaining that Waffle House was investigating his complaint, and she asked him to complete an Associate Discrimination Questionnaire. Plaintiff returned the completed questionnaire, and Waffle House reviewed his response and interviewed a number of witnesses.[7] Based on the investigation, Defendant concluded that Gyldholm had used a racial epithet and that he was fired on the day of the incident. Defendant concluded that appropriate action had been taken and sent Plaintiff a letter advising him that it had found that sufficient evidence existed to support his allegations and that appropriate action had been taken.[8] Plaintiff never heard anyone else use a racial slur at

---

[7] Plaintiff contends that he was not interviewed during this process. The investigator assigned to the case, Audry Tassinari, stated in her deposition that she spoke with Plaintiff on the phone, and she recounted their conversation. However, Plaintiff "does not believe" that he spoke with Tassinari.

[8] Plaintiff contends that appropriate action was not taken—that terminating Gyldholm was not enough. He asserts that Defendant should have apologized to him, shown him sympathy, and had a meeting with the staff regarding the incident. Because Defendant did not do these things, Plaintiff argues, Defendant "affirmatively excused" the racist behavior. The Court disagrees. Defendant's response was far from an affirmative excuse of racist behavior—Defendant punished the offender on the day of the

Waffle House. More than a month after the April 9 incident, Plaintiff experienced a medical problem while he was at work (he contends that it was a heart attack and stroke, but Plaintiff's medical report does not reflect such a diagnosis). He contends that the medical incident was precipitated by stress due to the April 9 incident.

Plaintiff alleges that after the April 9 incident and after he reported the incident, his supervisors cut his hours, declined to give him a raise, "nitpicked" his performance, and gave him "the cold shoulder." He did not make a complaint to the Hotline regarding these issues. Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") regarding these matters in June 2004. Plaintiff does not believe that his supervisors were aware of his EEOC charge.

On November 5, 2004, Plaintiff received two write-ups for failing to complete his end-of-shift responsibilities by not doing prep work. When Altayli, Plaintiff's supervisor at the time, attempted to give these write-ups to Plaintiff, Plaintiff refused to sign them and threw them in the trash. According to Altayli, Plaintiff used vulgar language and acted belligerently. Plaintiff admits to using profanity, but he denies being "belligerent." Rather, he characterizes his behavior as "disputing" the write-ups. During this exchange, Altayli believed he smelled alcohol on Plaintiff's breath. Plaintiff admits that Altayli told Plaintiff

---

offense by terminating him and placing him on the "ineligible for rehire" list. Moreover, there is evidence that Stephens spoke with each member of the staff at Unit 1189, individually or in small groups, regarding the incident to reinforce that such behavior was unacceptable.

that he smelled alcohol on Plaintiff's breath.  Plaintiff denied using alcohol that day,[9] and he offered to take a Breathalyzer test. Altayli consulted with his supervisor, Sparks, and they decided to terminate Plaintiff based on Altayli's perception that Plaintiff reported for work under the influence of alcohol, based on the failure to complete end-of-shift duties, and based on Plaintiff's behavior—including vulgar language—upon receiving the write-ups.

## DISCUSSION

*1. Race Discrimination Claims*

Plaintiff contends that he was subjected to a hostile work environment based on his race.[10]  This alleged hostile work environment consists of the April 9 incident—when Gyldholm, a coworker, said to Plaintiff, "you just anybody's nigger" and then clarified that he said "nigger, not nigga."  To make out a prima facie case of hostile work environment racial harassment under Title VII and § 1981,[11] Plaintiff must show (1) that he belongs to a protected group, (2) that he was subjected to unwelcome racial

---

[9] Plaintiff admits that he would, on occasion, have "a couple of beers" before work, but he asserts that November 5, 2004 was not one of those days.

[10] To the extent that Plaintiff's Complaint alleges any other adverse action based on his race, the Court does not analyze those claims as racial disparate treatment claims because Plaintiff has asserted that those adverse actions were taken not because Plaintiff was black but because he reported being the victim of racial discrimination.  Moreover, Plaintiff has pointed to no evidence to show that Defendant took any other alleged adverse actions because of Plaintiff's race.

[11] For discrimination claims, including hostile work environment claims, Title VII and § 1981 "have the same requirements of proof and use the same analytical framework."  *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998); *see Shields v. Fort James Corp.*, 305 F.3d 1280, 1282 (11th Cir. 2002) (explaining "symbiosis" between Title VII and § 1981 hostile work environment claims).

8

harassment, (3) that the harassment was based on his race, (4) that the harassment "'was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment,'" and (5) a basis for holding Defendant liable. *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1257 (11th Cir. 2003) (quoting *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc)) (sexual harassment case). Here, even if Plaintiff could establish all of the other elements, he certainly could not satisfy the "severe or pervasive" requirement. To determine whether harassment objectively alters an employee's terms or conditions of employment, the following four factors are considered: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc). These factors may be met if racial slurs by co-workers are so "'commonplace, overt and denigrating that they create[] an atmosphere charged with racial hostility.'"[12]  *Edwards v. Wallace Cmty. College*, 49 F.3d 1517, 1521 (11th Cir. 1995) (quoting *E.E.O.C. v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068 (11th Cir. 1990)).

---

[12]Plaintiff asserts that Gyldholm's statements were just part of a "culture of racism" at Unit 1189. He asserts that a different Unit 1189 employee used the same racial slur—outside Plaintiff's presence—a few weeks before the April 9 incident, contending that this other incident shows that there was a "culture of racism" at Unit 1189 and that Gyldholm was trying to "fit in." However, the record reflects that Gyldholm was terminated on the day he used the epithet and that the other employee was suspended without pay for a period of time. Without some evidence that the racial slurs were reported but went unpunished or some other evidence of a racially charged atmosphere, the Court cannot find that the April 9 incident was part of a larger problem that Defendant failed to address.

However, the evidence in this case shows only two offensive comments by one employee on the same day within a very short period of time. This is simply not enough to meet the "severe or pervasive" requirement.[13]  Therefore, the Court finds that Plaintiff has failed to make out a prima facie case of hostile work environment racial harassment, and Defendant is entitled to summary judgment on these claims.

*2. Retaliation Claims*

In addition to his racial hostile work environment claim, Plaintiff contends that Defendant retaliated against him for reporting racial discrimination by cutting his hours, refusing to give him promised raises, failing to promote him, nitpicking his performance, disciplining him more harshly than his coworkers, giving him "the cold shoulder," and ultimately terminating him.  Because Plaintiff has presented only circumstantial evidence of retaliation and no direct evidence of retaliation, the Court will analyze his claims under the analytical framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).[14] *See Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993).  Under this framework, the plaintiff must establish a prima

---

[13] Plaintiff correctly notes that isolated incidents may be sufficient to meet the "severe or pervasive" requirement. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  Plaintiff fails to acknowledge, however, that an isolated incident meets this requirement *only* if it is "*extremely serious.*" *Id.*  The extremely serious isolated incident rule does not contemplate one or two utterances of non-threatening speech.

[14] Direct evidence is evidence that establishes the existence of discriminatory (or retaliatory) intent behind the employment decision without any inference or presumption. *See Standard v. A.B.E.L. Services, Inc.,* 161 F.3d 1318, 1331 (11th Cir. 1998).  Here, Plaintiff has pointed the Court to no direct evidence of retaliatory intent.

facie case of retaliation. If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the challenged employment action. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001); *see McDonnell Douglas*, 411 U.S. at 802; *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc). The employer's burden at this point is a burden of *production*—the employer must "clearly set forth, through the introduction of admissible evidence, the reasons for the [challenged employment action]." *Burdine*, 450 U.S. at 255. If the employer meets its burden of production, then to avoid summary judgment the plaintiff must come forward with evidence, including evidence establishing the prima facie case, sufficient to create a "genuine issue of material fact regarding whether *each* of the defendant employer's articulated reasons" is pretext for retaliation. *Chapman*, 229 F.3d at 1024, 1037; *see also Burdine*, 450 U.S. at 255-56; *Pennington*, 261 F.3d at 1266. Although a plaintiff cannot prove that the proffered reasons were pretext for discrimination simply by showing that the reasons were false, rejection of the employer's proffered reasons will in some cases permit an inference of retaliation. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000) ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.").

To establish a prima facie case of employment retaliation, a plaintiff must show that (1) he engaged in statutorily protected

activity, (2) he suffered an adverse employment action, and (3) there is some causal connection between the protected activity and the adverse employment action.[15] *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1454 (11th Cir. 1998). In this case, the Court assumes for the purposes of reviewing this summary judgment motion that Plaintiff engaged in protected activity when he called the Hotline to complain about the April 9 incident.[16] The remaining question, therefore, is whether Plaintiff suffered any adverse employment action and, if so, whether there is a causal connection between the Hotline complaint and the adverse employment action.

An "adverse employment action" is an action that is "objectively serious and tangible enough" to alter Plaintiff's "compensation, terms, conditions, or privileges of employment, deprive [him] of employment opportunities or adversely affect[] [his] status as an employee." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 588 (11th Cir. 2000). To constitute an adverse employment action, an action need not be an ultimate employment decision, such as termination, but it must meet "some threshold level of substantiality." *Wideman*, 141

---

[15] This prima facie case of retaliation was developed in the Title VII context. The Eleventh Circuit recognizes that § 1981 prohibits retaliation based on the exercise of rights protected by § 1981, such as the right to challenge racial discrimination. *Andrews v. Lakeshore Rehab. Hosp.*, 140 F.3d 1405, 1412-13 (11th Cir. 1998). Although the Eleventh Circuit has not explicitly held that the elements of a § 1981 retaliation claim are the same as the elements of a Title VII retaliation claim, *see Tucker v. Talladega City Sch.*, No. 05-11562, 2006 WL 688967 (11th Cir. Mar. 20, 2006), the Court sees no reason why the Title VII standard should not apply to Plaintiff's § 1981 retaliation claims in this case, where Plaintiff's retaliation claims arise out of his complaint regarding alleged racial discrimination against him.

[16] According to Plaintiff, his supervisors did not know about his EEOC charge when they took adverse actions against him, and Plaintiff filed the lawsuit after he was terminated.

F.3d at 1456. In determining whether this burden has been met, the courts look to the "totality of the alleged reprisals." *Cotton v. Cracker Barrel Old Country Store*, 434 F.3d 1227, 1234 (11th Cir. 2006).

To prove a causal link, a plaintiff must demonstrate that the protected activity and the adverse action were not "wholly unrelated." *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999). A plaintiff may establish the causal link by showing a close temporal proximity between the decisionmaker's knowledge of the protected activity and the adverse employment action.[17] *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004).

Plaintiff has alleged several actions he considers to be adverse employment actions taken in retaliation for his protected activity: Defendant, through its supervisors, (1) cut Plaintiff's hours, (2) failed to give Plaintiff promised raises, (3) failed to promote him, (4) disciplined Plaintiff more harshly than his coworkers, (5) nitpicked Plaintiff's performance, (6) gave Plaintiff "the cold shoulder," and (7) terminated him. Each alleged action is addressed in turn.

*a. Cut in Plaintiff's Hours*

Plaintiff contends that he was hired as a full-time employee to work 30 to 40 hours per week at the Waffle House and that his hours were cut after he complained about the April 9 incident. Defendant disputes this assertion and claims that Plaintiff was hired to work

---

[17] The temporal proximity must be "very close." *Higdon v. Jackson* 393 F.3d 1211, 1220 (11th Cir. 2004). The Eleventh Circuit has held that a period of one month between the protected activity and the adverse employment action qualifies as "close temporal proximity." *Id.* A three-month lapse does not. *Id.*

13

part time, 20 hours per week. It is undisputed that Plaintiff worked 35.7 hours during his first week at Waffle House. Defendant contends that this schedule was anomalous and that Plaintiff worked extra hours that week because it was a holiday week. The second week, Plaintiff worked 20.3 hours. The third week—the week of the April 9 incident—Plaintiff worked 20 hours. Thereafter, Plaintiff did not work more than 21 hours per week.

Even if the Court assumed that Plaintiff correctly understood that he had been hired as a full-time employee, the Court still could not find that there was a causal connection between the reduction in hours and Plaintiff's call to the Hotline. That is because Plaintiff's only evidence of causation is the temporal proximity between the protected activity and the reduction in hours. However, temporal proximity is not sufficient to establish causation here because Plaintiff's hours were initially reduced *before* the April 9 incident and *before* Plaintiff's complaint about the incident. *Cf. Cotton v. Cracker Barrel Old Country Store*, 434 F.3d 1227, 1232 (11th Cir. 2006) ("Where an employer contemplates a given action before the harassment takes place, temporal proximity between the action and the incident of harassment alone will not suffice to show causation."). For this reason, Plaintiff has failed to establish a prima facie case of retaliation with regard to the alleged reduction in hours.

*b. Failure to Give Plaintiff Raises*

Plaintiff claims that Stephens promised him regular pay raises. It is undisputed that Plaintiff never received a pay raise during his 2004 employment with Waffle House. But even assuming *arguendo* that Plaintiff established a prima facie case of retaliation based on the denial of pay raises, Defendant has proffered a legitimate non-

14

retaliatory reason: Plaintiff's poor performance did not qualify him for a raise. Plaintiff has not pointed to evidence sufficient to show a genuine issue of material fact regarding whether Defendant's articulated reason is pretext for retaliation. The undisputed evidence shows that there were no automatic raises for grill operators, that Stephens did not have authority to approve a raise for Plaintiff, and that to be considered for a raise by the district manager, a grill operator must meet certain requirements, including completing end-of-shift responsibilities, cooking a minimum amount of food per hour, arriving to work on time, and wearing a proper uniform. Plaintiff admits that he violated the uniform policy and that he was occasionally late to work. In addition, Stephens believed that Plaintiff was unable to cook the required amount of food per shift, and there is no evidence to show that this assessment was not made in good faith. This evidence supports a finding that Plaintiff was denied a raise because of poor performance, and Plaintiff has not rebutted this explanation as pretextual. *See Pennington*, 261 F.3d at 1266-67. Therefore, Defendant is entitled to summary judgment as to Plaintiff's retaliatory raise denial claims.

    *c. Failure to Promote Plaintiff*

To the extent that Plaintiff claims that Defendant retaliated against him by failing to promote him, Plaintiff has not established that he suffered an adverse employment action—that he was denied a promotion. Specifically, Plaintiff has not pointed to a position he claims he should have received, and he has presented no evidence to show that he applied for a promotion. The Court cannot simply assume that Plaintiff was denied a promotion—there must be some evidence that there was an open position and that Plaintiff applied for it but

was denied that promotion. *See Walker v. Mortham*, 158 F.3d 1177, 1186, 1193 (11th Cir. 1998) (defining elements of promotion discrimination prima facie case). For this reason, Plaintiff has failed to establish a prima facie case of retaliation with regard to the alleged promotion denial.

### d. *Plaintiff's Termination*

Plaintiff asserts that his employment was terminated in retaliation for protected activity. It is clear that termination is an "adverse employment action." *Gupta*, 212 F.3d at 587. However, Plaintiff has not established a causal connection between the protected activity and the termination. First, there is no "very close" temporal proximity between the protected activity and the termination—rather, there was a lapse of seven months between the Hotline call and the termination.[18] *Cf. Higdon*, 393 F.3d at 1220 (noting that three-month lapse is too protracted to be "close temporal proximity"). Second, there is no other evidence to connect the termination to the protected activity.[19] Finally, even if

---

[18] Although the EEOC charge could be considered protected activity, Plaintiff has pointed to no evidence that any supervisor knew of the EEOC charge prior to Plaintiff's termination. Therefore, the Court cannot find any causal connection between the EEOC charge and the termination.

[19] Plaintiff contends that the temporal proximity is irrelevant because Plaintiff was subjected to a "retaliatory hostile work environment" at the hands of his supervisors from the time of his Hotline call until his termination. This alleged hostile work environment included allegedly disparate write-ups, nitpicking Plaintiff's performance and giving Plaintiff "the cold shoulder." Even if a hostile work environment suffices to establish causation where there is no close temporal proximity between the protected activity and the adverse action, Plaintiff does not allege conduct that is "severe or pervasive" enough to alter the terms and conditions of his employment or create a retaliatory abusive working environment. *See Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1242 (11th Cir. 2001) (noting that Title VII protection does not extend to "everything that makes an employee unhappy," such as unwelcome day-to-day

Plaintiff *had* established a prima facie case of retaliation based on his termination, Defendant has articulated a legitimate non-retaliatory reason for Plaintiff's termination: when Plaintiff received write-ups for failing to complete his end-of-shift duties, he threw them in the trash, used vulgar language, and acted in a way his supervisor described as "belligerent."  Moreover, Plaintiff's supervisor believed that Plaintiff had reported to work under the influence of alcohol.  Plaintiff contends that these proffered reasons are pretextual, denying the alcohol use and characterizing his conduct as merely "disputing" the write-ups.  However, Plaintiff has pointed to no evidence sufficient to show a genuine issue of material fact regarding whether Defendant's articulated reason for the termination is pretext for retaliation.  Even putting aside the alcohol issue, it is undisputed that Plaintiff's reaction to the write-ups included throwing the write-ups in the trash, walking out of the office and using vulgar language.  No evidence has been identified from which a reasonable fact finder could conclude that any other similarly situated employee was treated different than Plaintiff was treated.  Plaintiff has simply failed to identify a valid comparator.  *Cf. Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (noting that to prove disparate discipline, plaintiff must show that a similarly situated employee outside the protected class engaged in the same or similar conduct but was disciplined differently).  For all of these reasons, Defendant is entitled to

---

critiques); *cf. Mendoza*, 195 F.3d at 1246-48 (cataloging, in sexual harassment case, minimum level of severity established by other circuits to establish hostile work environment's "severe or pervasive" requirement).

summary judgment as to Plaintiff's retaliation claims based on his termination.

    *e. "Retaliatory Hostile Work Environment"*

Plaintiff also argues that he was subjected to a "retaliatory hostile work environment" by Defendants. This "retaliatory hostile work environment consists" of the following: nitpicking Plaintiff's performance and giving Plaintiff "the cold shoulder."[20] Even if the Eleventh Circuit were to recognize a cause of action for retaliatory hostile work environment[21]—with retaliatory harassment severe or pervasive enough to alter the terms and conditions of employment—the conduct alleged here falls well short of that standard. *Cf. Mendoza*, 195 F.3d at 1246-48. It also falls short of the "threshold level of substantiality" required to be a cognizable adverse employment action because it is not "objectively serious and tangible enough" to alter

---

[20] Plaintiff also contends that he was disciplined differently than similarly situated employees who had not made reports to the Hotline, but the record does not support this claim. Specifically, Plaintiff asserts that he was issued a write-up when he was tardy but that Julia Moore, who had driven Plaintiff to work and was also tardy, did not receive a write-up. However, there is no evidence that Moore was similarly situated to Plaintiff. *See Holifield*, 115 F.3d at 1562 (requiring, to prove disparate discipline, similarly situated comparator). The evidence is that Waffle House employees did not receive a write-up for tardiness on the first or second offense—rather, they received verbal warnings. Plaintiff has pointed to no evidence showing that he and Moore had a similar history of tardiness and tardiness warnings. Plaintiff also contends that he received write-ups for failing in his end-of-shift responsibilities but that other employees did not. However, Plaintiff points to no specific similarly situated employee who had similar performance problems with regard to end-of-shift responsibilities but did not receive a write-up. Therefore, the Court cannot find that Plaintiff was subjected to disparate discipline.

[21] The Eleventh Circuit has not recognized a cause of action for retaliatory hostile work environment. However, the Eleventh Circuit has analyzed alleged adverse actions collectively to determine whether they meet the "threshold level of substantiality" to be a cognizable adverse employment action. *See Wideman*, 141 F.3d at 1456.

Plaintiff's "compensation, terms, conditions, or privileges of employment, deprive [him] of employment opportunities or adversely affect[] [his] status as an employee." *Gupta* 212 F.3d at 588. Although performance nitpicking and a cold relationship with a supervisor might cause an employee to lose some self-esteem, the federal employment laws are not a "general civility code," and they do not make actionable the "ordinary tribulations of the workplace." *Id.* at 587. Moreover, "unwelcome day-to-day critiques and assertedly unjustified negative evaluations" are generally not enough to meet the adverse employment action requirement. *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1242 (11th Cir. 2001). For these reasons, the Court cannot find that the nitpicking and "the cold shoulder," even viewed collectively, constitute an adverse employment action, and Defendant is entitled to summary judgment on these claims.

## CONCLUSION

For the reasons discussed *supra*, the Court grants Defendant's Motion for Summary Judgment as to Plaintiff's Title VII and § 1981 claims. The Court declines to exercise jurisdiction over Plaintiff's state law claims, and those claims are dismissed without prejudice. *See* 28 U.S.C. § 1367(c)(3).

IT IS SO ORDERED, this 5th day of June, 2006.

                                      S/Clay D. Land
                                          CLAY D. LAND
                                UNITED STATES DISTRICT JUDGE